Present:  Hassell, C.J., Keenan,[1] Koontz, Lemons, Goodwyn, and
Millette, JJ., and Lacy, S.J.

CITY OF ALEXANDRIA

                                    OPINION BY SENIOR JUSTICE
v.   Record No. 090659                  ELIZABETH B. LACY
                                         APRIL 15, 2010
J-W ENTERPRISES, INC.

            FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                       Donald M. Haddock, Judge

     This appeal in a contribution action arises from an

incident involving the pursuit of a group of restaurant patrons

who left the restaurant without paying their check.  The pursuit

by an off-duty police officer who had been hired by the

restaurant to provide a law enforcement presence resulted in the

tragic shooting death of one of the patrons.  The issue we

decide on appeal is whether the trial court erred in holding

that the off-duty police officer was performing a public

function at the time of the shooting, thereby defeating the

City's action for contribution.

                               FACTS

     We review the facts in the light most favorable to the

prevailing party.  See Bitar v. Rahman, 272 Va. 130, 137, 630

S.E.2d 319, 323 (2006).

     At the time of the incident, J-W Enterprises, Inc. (JWE)

owned and operated an International House of Pancakes (IHOP)

---

     [1] Justice Keenan participated in the hearing and decision of
this case prior to her retirement from the Court on March 12,

restaurant in the City of Alexandria (the City).  Carl Frederick Stowe, Jr. was employed as a police officer with the City of Alexandria Police Department (the Department) and also worked as an off-duty police officer for JWE at the IHOP restaurant.

Stowe's off-duty work was treated by the Department as an "extra-duty detail" or secondary employment of an officer organized and approved by the Department, which required that the officers be in full police uniform.  Stowe had been working as an off-duty officer at the IHOP restaurant for approximately ten years at the time of the incident at issue in this case.

IHOP paid Stowe and the other officers who worked the detail an hourly rate, which was, along with the other conditions of their employment, governed by the Alexandria Police Extra Duty Employment Agreement (the Agreement) between the City and JWE.  The Agreement provided specifically that "[a]ll detail officers are to enforce all state and local laws on [IHOP's] property.  Officers will also provide a law enforcement presence in the store."  All extra-duty details were subject to approval by the Chief of Police, along with the schedules and the officers to be assigned.  IHOP was not able to select the officers that worked the detail, and could not act directly to reprimand or replace an officer, but could communicate any concern to the detail coordinator.  Department

2010.

2

directives stated that an officer could "engage in extra-duty employment only when the [officer's] full police powers are in effect."

IHOP management, consistent with the terms of the agreement, directed the officers to remain inside the restaurant to provide a "law enforcement presence." IHOP employees customarily would notify the officers when they suspected a problem, but did not instruct the officers about performing law enforcement functions. IHOP employees did not direct the officers to collect on any unpaid bills, and left it to the officers to "determine what the best method of dealing with that crime would be," including whether to pursue a party that had not paid, though IHOP management could request that the officer not pursue such parties.

The incident at issue in this case began when an IHOP server informed Officer Stowe that the group he was serving had previously "walked out" on a bill: that is, when a patron orders, receives, (usually) consumes a meal, and then leaves the premises without paying, a class one misdemeanor. Code § 18.2-188. The server indicated that the group had not paid, though some members of the party had left. Officer Stowe assured the server that he would "keep an eye on them." Shortly thereafter, a hostess informed Officer Stowe that the remaining two members of the dining group were leaving without paying the server or

stopping at the cash register to pay.  Officer Stowe called out to the individuals as they were leaving.  They turned, made eye contact, and fled, leading Stowe to conclude that the individuals had committed a misdemeanor "in his presence," providing "probable cause" to "make an arrest" or, at the least, obligated him "to try to obtain the [suspects'] information so that a warrant could be issued for th[e suspects] at a later time."

As the suspects left the restaurant, Officer Stowe "yelled to them again" and pursued them out of the IHOP into the parking lot.  The suspects hurried to a vehicle whose engine was running, which, upon their entrance, accelerated through the parking lot and past Officer Stowe, who was motioning for the vehicle to stop.  Stowe, believing the driver did not see him, proceeded across the lot and positioned himself in a lit area between the car and the lot's exit to interdict the fleeing party.  As the car drove toward the exit, tires "squealing," Officer Stowe again motioned for the vehicle to stop.  The driver of the vehicle again ignored the officer's direction to stop.  The vehicle then veered off its course to the exit and towards Officer Stowe at a high rate of speed, causing him to believe "that the driver was trying to . . . run [him] down."

Officer Stowe, fearing for his safety, moved out of the roadway "in a semi-circle type fashion [to a place] between the

4

parked cars that [were] immediately to [the officer's] right-hand side."  With the vehicle coming toward him at a high rate of speed, Officer Stowe drew his sidearm, a semi-automatic Glock Model 23, opened fire, and continued to fire as the vehicle passed his position.  One of the bullets struck Aaron Brown, a passenger in the vehicle, killing him.

## PROCEEDINGS

Aaron Brown's parents, as the co-administrators of his Estate, entered into an out-of-court settlement with the City of Alexandria.  Under the terms of the settlement, the City paid the Estate $1,100,000 and the Estate released all claims against the City, JWE, the president of JWE, William Trout, and Officer Stowe.  In the settlement agreement, the City also agreed to pursue a claim for contribution or indemnity against JWE and Trout and to turn over to the Estate the proceeds of any such claim.

In accord with the settlement agreement, the City filed this litigation pursuant to Code §§ 8.01-34 and 8.01-35.1 seeking contribution from JWE and Trout.[2]  In its amended complaint, the City asserted that Officer Stowe was an employee of JWE and was acting within the scope of that employment at the time he caused the fatal injury to Aaron Brown.  The City

_____

[2] The trial court granted Trout's motion to strike him as a defendant and that ruling is not before us on appeal.

5

further admitted for purposes of the litigation that it was a joint tortfeasor, asserted the settlement was reasonable, and sought recovery of one-half of the settlement amount paid to the Estate.

During the three-day bench trial, Officer Stowe testified that he understood his job description as requiring that he "be visible to deter walk-outs, disorderly customers, turf fights. And if a patron would leave the IHOP without paying, we would stop that individual to see if they could pay their bill," an understanding that had been communicated to him by other officers, and reiterated by managers of the IHOP.  Officer Stowe did not personally collect unpaid monies from patrons.  Officer Stowe testified that IHOP provided no equipment or training and could not override Department directives regarding what apparel would be worn, or whether the officers would be armed.

Officer Stowe testified that the purpose of his actions during the event in issue, from calling out to the individuals who were leaving to pursuing them into the parking lot, was to "stop them and to have them take care of the tab."  Officer Stowe testified that he was attempting to obtain that information when he pursued the individuals, that he was utilizing his discretion as to the appropriate response, i.e., proceeding according to "police training and directives," and that from the time he witnessed the group leaving the restaurant

6

without paying until the moment of the shooting he was "acting as a police officer."

Following the ore tenus hearing and argument of counsel, the trial court held that the City was not entitled to contribution from JWE on a number of alternative grounds: (1) that at the time of the shooting, Officer Stowe was "performing a police function, not a private function" for JWE; (2) that Officer Stowe was an independent contractor and not an employee of JWE; (3) that the proximate cause of Aaron Brown's death was the combined actions of the driver of the car and Officer Stowe; (4) that Officer Stowe was acting in self-defense when he shot at the oncoming car[3] and therefore was not negligent; and (5) that the City was a "volunteer" when it paid the settlement to the Estate because the City was absolutely immune for actions taken in a governmental capacity. The trial court entered an order dismissing the City's amended complaint and denied its motion for reconsideration. The City filed a timely appeal to this Court.

DISCUSSION

On appeal, the City challenges each of the alternative grounds upon which the trial court dismissed the contribution

_____

[3] The City, in response to an interrogatory, admitted that Officer Stowe was acting in self-defense when he shot and killed Brown.

7

action. The City first asserts that the trial court erred as a matter of law in holding that Officer Stowe was "necessarily acting solely in his public capacity" when he fired the shots that killed Aaron Brown.[4] The City says this holding was error because the "uncontradicted evidence was that the officer's sole purpose in confronting the vehicle was to collect a bill for [JWE]" and argues that the trial court erroneously interpreted Virginia law by holding "that an off-duty police officer could never be acting as a dual agent at any one time."

Specifically, the City argues that the trial court "erroneously concluded that, under Virginia law, it was not possible for an off-duty police officer simultaneously to serve a municipality and a private employer." The City maintains that because of this erroneous legal conclusion, this Court should set aside the trial court's factual decision that, at the time of the shooting, Officer Stowe was acting in a public capacity and hold as a matter of law that the officer was acting either solely on behalf of JWE or was simultaneously performing both public and private duties. We disagree with the City.

---

[4] Contrary to the City's statement in this assignment of error, nothing in the record indicates that the trial court found that the officer was "necessarily" acting in his public capacity, only that he was acting in his official capacity as a matter of fact.

8

For many years, private employers have employed special officers pursuant to special officer statutes, see Code § 56-353; Norfolk & W. Ry. Co. v. Haun, 167 Va. 157, 160-62, 187 S.E. 481, 482-83 (1936), or, as in this case, cooperative agreements between police departments and private employers, pursuant to Code § 15.2-1712. Not surprisingly then, this Court has considered a number of cases involving the liability of a private company for the tortious acts of an off-duty police officer occurring while the officer was in the employ of the private company. As the City contends, this Court has acknowledged that a person who is a police officer is not precluded from also acting in the capacity of an agent or employee of a private employer. Clinchfield Coal Corp. v. Redd, 123 Va. 420, 431, 96 S.E. 836, 839 (1918). However, this Court has consistently held that, when considering tort liability, it is a factual question whether the officer was acting as an employee of the private employer or as a public officer enforcing a public duty when the wrongful conduct occurred. Id. at 431, 435, 96 S.E. at 839-40; accord Glenmar Cinestate, Inc. v. Farrell, 223 Va. 728, 735, 292 S.E.2d 366, 369-70 (1982); Norfolk Union Bus Terminal, Inc. v. Sheldon, 188 Va. 288, 294-95, 49 S.E.2d 338, 340-41 (1948); Haun, 167 Va. at 160-61, 165, 167, 187 S.E. at 482, 484-85. We most recently reaffirmed this

9

principle in Godbolt v. Brawley, 250 Va. 467, 472-73, 463 S.E.2d 657, 660-61 (1995).

In Godbolt, an off-duty deputy sheriff was working as a security guard for a restaurant when two Godbolt brothers were ejected from the premises because of an altercation in the restaurant. Id. at 469, 463 S.E.2d at 658-59. A fight ensued outside the restaurant while the off-duty deputy was attempting to detain the brothers until the police arrived. Id. at 469, 463 S.E.2d at 659. In the course of the fight, the deputy shot both brothers. Id. In a tort action brought by one of the brothers against the deputy and the restaurant as the deputy's employer, the trial court entered summary judgment for the employer. Id. In reversing that judgment and holding that whether the deputy was acting as an employee of the restaurant at the time of the incident was a question to be submitted to the jury, this Court stated

> "[t]he test is: in what capacity was the
> officer acting at the time he committed the
> acts for which the complaint is made? If he is
> engaged in the performance of a public duty
> such as the enforcement of the general laws,
> his employer incurs no vicarious liability for
> his acts, even though the employer directed him
> to perform the duty. On the other hand, if he
> was engaged in the protection of the employer's
> property, ejecting trespassers or enforcing
> rules and regulations promulgated by the
> employer, it becomes a jury question as to
> whether he was acting as a public officer or as
> an agent, servant, or employee."

Id. at 472-73, 463 S.E.2d at 660-61 (quoting Glenmar, 223 Va. at 735, 292 S.E.2d at 369-70). This test, originally set out in Haun, has not been altered by this Court over the course of many decades.[5] Applying our jurisprudence has not provided private employers blanket immunity, Godbolt, 250 Va. at 472-73, 463 S.E.2d at 660-61; Sheldon, 188 Va. at 294-95, 49 S.E.2d at 340-41; Clinchfield, 123 Va. at 431-34, 96 S.E. at 839-40, but has made determinations of tort liability dependent upon the

---

[5] As the City points out, some other jurisdictions have adopted different tests, see, e.g., Dillard Dep't Stores, Inc. v. Stuckey, 511 S.W.2d 154, 155 (Ark. 1974); Lovelace v. Anderson, 785 A.2d 726, 741-43 (Md. 2001); White v. Revco Discount Drug Centers, 33 S.W.3d 713, 718-23 (Tenn. 2000). It appears, however, that a majority of jurisdictions join Virginia in looking to the "nature of the act" that is the proximate cause of the injury complained of when determining tort liability. See White, 33 S.W.3d at 719 & nn.3-4; see, e.g., Lande v. Menage Ltd. P'ship, 702 A.2d 1259, 1261 (D.C. 1997) ("[A] private entity which employs a police officer during his off-duty hours is not liable for actions of the officer in carrying out his public duty as a police officer."); Sommerfield v. Blue Cross & Blue Shield of Ga., Inc., 509 S.E.2d 100, 103 (Ga. Ct. App. 1998) ("If the police officer, while working for the private employer, 'was performing public duties, not at the direction of the private master,' the employer will not be held liable.") (citation omitted); Gentry v. Hockett, 498 N.E.2d 405, 406 (Ind. Ct. App. 1986) (" 'It is the nature of the acts performed and not whether the officer was on or off duty, in or out of uniform, which determines whether the officer is acting in his official capacity.' ") (citation omitted); State v. Phillips, 520 S.E.2d 670, 681 (W. Va. 1999) ("[A]n off-duty municipal police officer employed by a private entity as a security guard retains his or her official police officer status even in the private employment, unless it is clear from the nature of the officer's activities that he or she is acting in an exclusively private capacity or engaging in his or her private business.").

particular circumstances of each case. Accordingly, the trial court did not err when it applied this well-established test and determined as a factual matter the capacity in which Officer Stowe was acting at the time he discharged his weapon.

The City argues further, however, that the uncontradicted evidence shows that the trial court erred in its factual finding that Officer Stowe was acting in his official police capacity at the time of the shooting.

The principles of appellate review we apply to this claim are well established. We will not disturb a factual finding unless it is plainly wrong and without evidence to support it. See Collins v. First Union Nat'l Bank, 272 Va. 744, 749, 636 S.E.2d 442, 445-46 (2006). The City is correct that the evidence adduced at trial was that Officer Stowe followed the restaurant patrons into the parking lot to "stop them and to have them take care of the tab." However, Officer Stowe also testified that when the patrons refused to heed his calls, he believed a misdemeanor had been committed in his presence; that no one from the restaurant directed his actions or told him to follow the patrons to the parking lot; that he utilized his police training once he believed the patrons were "tracking" him in the car; and that he believed he was at that time acting as a police officer. This evidence provided the trial court adequate grounds for finding that, at the time of the conduct in

12

question, Officer Stowe's actions were performed pursuant to his duties as a police officer, not as a JWE employee.

Accordingly, for the reasons stated, we will affirm the judgment of the trial court dismissing the City's claim for contribution from JWE.[6]

<u>Affirmed</u>.

---

[6] In light of this holding, we need not address the remaining errors assigned to the trial court's alternative grounds for dismissing the contribution action.